**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John BC Doe,<br><br>  Plaintiff,<br><br>v.<br><br>Byzantine Catholic Diocese of Parma, *et al.*,<br><br>  Defendants. | No. CV-21-01424-PHX-JJT<br><br>**ORDER** |

At issue is the Motion for Summary Judgment (Doc. 53, MSJ), supported by a Statement of Facts (Doc. 54, DSOF), filed by Defendant Byzantine Catholic Diocese of Parma aka The Eparchy of Parma (the "Eparchy"). Plaintiff John BC Doe filed a Response (Doc. 55, Resp.) supported by a Statement of Facts (Doc. 56, PSOF), and the Eparchy filed a Reply (Doc. 57, Reply) supported by a Statement of Facts (Doc. 58, Reply SOF). The Court finds it appropriate to resolve the Motion without oral argument. LRCiv 7.2(f).

**I.  BACKGROUND**

On December 29, 2020, Plaintiff filed suit in Arizona state court to raise negligence claims against Defendants the Eparchy and St. Stephen Byzantine Catholic Cathedral ("St. Stephen") alleging that Fr. Alexander Nanko (also known as "Father Al")—an employee of the Eparchy and St. Stephen—sexually abused him beginning when he was approximately 11 or 12 years old. (Doc. 1-7, Compl.) Plaintiff "was raised in a Byzantine Catholic family and attended St. Stephen, in Phoenix, during the years that St. Stephen was under the authority and control of the Eparchy of Parma." (Compl. ¶ 15.)

On July 22, 2021, Plaintiff voluntarily dismissed his claims against St. Stephen, an Arizona Defendant, and on August 17, 2021, the Eparchy—an Ohio Defendant—removed the action to this Court based on diversity jurisdiction under 28 U.S.C. § 1332. On October 1, 2021, Plaintiff filed a First Amended Complaint to add claims against another Arizona Defendant, the Roman Catholic Church of the Diocese of Phoenix (Doc. 18, FAC), but the Court dismissed those claims as untimely (Doc. 31).

According to Plaintiff's deposition testimony, in the 1970s, Fr. Nanko conducted mass at St. Stephen, ran church operations, and lived in the rectory within the church. (Doc. 56-7, Dep. of John BC Doe ("Pl. Dep.") at 44, 104.) An older priest, Fr. John Bovankovich, was also employed at St. Stephen, conducted a Sunday mass in Russian, and lived in a home across the street. (Pl. Dep. at 45, 62, 65.) In 1971, when Plaintiff was approximately 11 years old, he began helping his father on Saturdays with construction and maintenance projects at the church, and soon after, Fr. Nanko began picking Plaintiff up at home, taking him to the church for projects on Saturdays, and allowing Plaintiff to stay overnight in a bedroom in the rectory until Sunday morning mass, when Plaintiff served as an altar boy. (Pl. Dep. at 42–43; PSOF Ex. 8.) Plaintiff's father was physically abusive to him, which he testified "Father Al knew . . . [s]o he would come and pick me up knowing I wanted to get away from that." (Pl. Dep. at 46–47, 77, 95.) "[I]t was either stay [at St. Stephen] or go home, and I just would have rather dodged Father Al and fought him off than go home and deal with my father." (Pl. Dep. at 48.)

Fr. Nanko had a beer tap in the rectory and would encourage Plaintiff to drink beer and sit on the sofa in the rectory while they watched Fr. Nanko's color television. (Pl. Dep. at 51, 53.) Not long after Plaintiff began spending Saturday nights in the rectory, Fr. Nanko started kissing Plaintiff and rolling on top of him; Plaintiff testified, "he would kiss me with that cigar mouth, and it would just taste horrible." (Pl. Dep. at 51, 53, 112.) Fr. Nanko then began entering Plaintiff's bedroom in the rectory at night, performing oral sex on Plaintiff, and rubbing his penis on Plaintiff's body. (Pl. Dep. at 53–55.) Plaintiff estimated these sessions would last for "hours," and Plaintiff testified he would often pass out from

1  having drunk so much beer while Fr. Nanko engaged in this conduct. (Pl. Dep. at 53, 55,
2  58.) Plaintiff cannot recall the number of times this happened, but he estimated it occurred
3  six to 12 times a year from around 1972 until 1978, when he left the church, quit high
4  school, and left home. (Pl. Dep. at 46, 57, 92.)

5        Plaintiff testified that, on account of Fr. Nanko's abuse, he has been an alcoholic
6  since the age of 13 or 14 (Pl. Dep. at 73, 78, 108); by the time he was 18 years old, he had
7  no life aspirations and "stopped thinking about his future" (Pl. Dep. at 79–80); his two
8  marriages fell apart because he could not maintain a sexual relationship with his wives (Pl.
9  Dep. at 24, 60, 117); he could not bear the thought of having children and exposing them
10 to the possibility of abuse (Pl. Dep. at 94–95); he maintains no personal relationships with
11 other people (Pl. Dep. at 113, 117); and he has had a "really hard time sleeping" over the
12 course of his life (Pl. Dep. at 115).

13       In 1993, when Plaintiff's marriage to his wife Barbara was falling apart because of
14 his inability to be intimate with her, he sought help from a therapist, to whom he disclosed
15 the years of sexual abuse. (Pl. Dep. at 54, 60.) The therapist advised Plaintiff to tell Barbara
16 what had happened, which he did, and to tell the church. (Pl. Dep. at 56–57, 86–87.)
17 Plaintiff went to the Diocese of Phoenix to report the sexual abuse by Fr. Nanko, who was
18 still employed as a priest at St. Stephen in 1993. (Pl. Dep. at 56–57, 86–87; PSOF 8.) As a
19 result, the Bishop of the Eparchy of Van Nuys placed Fr. Nanko on indefinite
20 administrative leave on October 22, 1993. (PSOF Ex. 9.) Fr. Nanko passed away in 1994,
21 and a 2004 report revealed credible allegations that Fr. Nanko had sexually abused seven
22 minors in Arizona. (PSOF Ex. 10.)

23       In terms of the relief he seeks in this lawsuit, Plaintiff testified, "The first thing I
24 want is [the Eparchy] to admit what they did. They know what they did, and they covered
25 it up on purpose. That's what I want, the main thing. I want them to . . . take responsibility
26 for what they did finally." (Pl. Dep. at 118.)

27 . . .
28 . . .

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232. When the moving party does not bear the ultimate burden of proof, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party carries this initial burden of production, the nonmoving party must produce evidence to support its claim or defense. *Id.* at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, as long as it is supported by affidavits or other evidentiary material. *Anderson*, 477 U.S. at 255. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57

1  (holding that the plaintiff must present affirmative evidence in order to defeat a properly
2  supported motion for summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045
3  (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on
4  conclusory allegations unsupported by factual data." (citation omitted)).

### III.  ANALYSIS

In 2019, the Arizona Legislature enacted "window" legislation allowing claims involving sexual contact with a minor that would otherwise be time barred under an applicable statute of limitations to be "revived and . . . commenced before December 31, 2020." Ariz. Laws 2019, 1st Reg. Session, Ch. 259 § 3(B); H.B. 2466 (Docs. 55-1, 55-2); A.R.S. § 12-514 (2019). The statute allows the victim to file an otherwise-expired claim against the perpetrator of sexual abuse, as well as against a non-perpetrator if the victim can show by clear and convincing evidence that the non-perpetrator "knew or otherwise had actual notice" of actions on the part of an employee, a volunteer, a representative, or an agent constituting (1) sexual conduct or sexual contact with a minor, or (2) misconduct that creates an unreasonable risk of sexual conduct or sexual contact with a minor. Ariz. Laws 2019, 1st Reg. Session, Ch. 259 §§ 3(C), (D). Plaintiff's claims against the Eparchy were timely filed and fall under the non-perpetrator section of the statute.

The Eparchy now moves for summary judgment on two grounds. First, the Eparchy contends that Plaintiff has offered insufficient evidence from which a reasonable jury could conclude by clear and convincing evidence that the Eparchy had the requisite knowledge or actual notice. Second, the Eparchy argues that the window legislation violates the due process clause of the Arizona Constitution. The Court examines these arguments in turn.

### A.  Evidence of Knowledge or Actual Notice

Black's Law Dictionary defines "knowledge" as "[a]n awareness or understanding of a fact or circumstance." Black's Law Dictionary (7th ed. 1999). By comparison, a person has "notice" of a fact or condition if that person "(1) has actual knowledge of it; (2) has received a notice of it; (3) has reason to know about it; (4) knows about a related fact; or (5) is considered as having been able to ascertain it by checking an official filing or

recording." *Id.* "Actual notice" is "[n]otice given directly to, or received personally by, a party." *Id.* As the Court stated in its prior Order, the window legislation does not explicitly provide that a victim may bring a claim based on evidence that a non-perpetrator "should have known" or was "deliberately ignorant" of sexual conduct, sexual contact, or misconduct creating an unreasonable risk of sexual conduct or sexual contact with a minor. (Doc. 31 at 7 n.3.)

In his deposition, Plaintiff testified that, during the period in which Fr. Nanko ("Father Al") was sexually abusing him, he confessed as much to Fr. Bovankovich ("Father John"), the other priest at St. Stephen, as excerpted below:

> [Def.'s Counsel] Q: When did you tell Father John in confession about Father Al's—Father Nanko's abuse?
>
> [Plaintiff] A: I don't remember exactly.
>
> Q: And that's despite what you said earlier where you said the first person you ever told was Barbara?
>
> A: Yeah. I forgot about confessional.
>
> Q: Did you tell Father John in confession about Father Al on more than one occasion?
>
> A: I think so.
>
> Q: What was Father John's response?
>
> A: Say some Hail Marys and, you know, the Lord's prayer and go about your way.
>
> Q: He didn't say anything about Father Nanko?
>
> A: No.
>
> Q: He didn't say anything about steps he would take to address this with Father Nanko?
>
> A: No.          . . .

   Q:  And so do you recall how old you were when you went to confession with Father John and told him about Father Nanko's abuse?

   A:  Probably around the age of 12 or 13.  . . .

   Q:  Do you recall how many times you told Father John about Father Nanko's abuse?

   A:  A few. I don't remember exactly how I said it, just that, you know, he had touched me. I—you know, I didn't get into gory details about it, you know, in confession with Father John. And, you know, it's embarrassing, for one, and painful, for another. And, you know, I just said, you know, Father Al abused me or however I said it to him, you know. I don't remember exactly.

   Q:  Did he ask any follow-up questions?

   A:  No.

   Q:  Was it—

   A:  Basically they just listen and then give you your penances, or whatever you're supposed to do to absolve yourself.

(Pl. Dep. at 64–68.)

   [Pl.'s Counsel] Q:  And you testified that in the confessional you had told Father John that Father Alexander Nanko was touching you.

   [Plaintiff] A:  I said he molested—I think I said he molested me or something. I'm not sure the words I used but…

   Q:  And you understood that when you go to confession that what is said between the penitents, the person who's saying the confession, and the priest is protected, right?

   A:  Sacrosanct, I think is the word they use, yeah.

   Q:  You were not—you used the word sacrosanct.

   A:  I trusted that he wouldn't say anything. You know, confession is supposed to be between you and the priest and that's it.

> Q: When you're walking through the processional with Father in one of the big holy days, let's say Father Nanko and Father John, how did it make you feel knowing that Father John knew?
>
> A: Well, I was always—I always wondered, you know, what he was thinking as—and I was wondering, was he part of it or, you know, did he know and did he ever do it himself or—you know, a lot of things run through your brain when you're 13, 14 years old. I just—you know, I knew that he knew, but yet he walked beside him in procession.
> So in my mind it was accepted, I guess. I don't know. He knew so—and he kept—he kept walking with him every—you know, whatever it was and so…
>
> Q: When you say walking with him, you're referring to Father Nanko?
>
> A: Yes.
>
> Q: Did you ever wonder why he never said anything to protect you?
>
> A: I just—I just figured it was confession and it was supposed to stay just between me and him, I guess. I mean, back then I didn't—I didn't know what defrocking was and I didn't know what—why they didn't call the police.
>
> Q: Do you know now?
>
> A: Yeah, to cover their ass, that's why. You know, they just—you know, there's all—this all started—I mean, you know this stuff. In 1965 when they first found out that he did this to children, they let it go on for five years in Ohio, or Pennsylvania, wherever it was. Ohio, I think. And then they shipped him out to Arizona and—and put him at St. Stephen's church knowing what he did. And then they promoted him and gave him more responsibility. So now he's being rewarded. And they knew. The whole time they knew. And instead of defrocking him and calling the police and having him arrested, they sicced him on St. Stephen's church and then they sicced him on me. That's what really happened.

(Pl. Dep. at 106–08.)

In its responsive Statement of Facts, Defendant contends that "there is no time reference when the referenced conversation [*i.e.*, the confession] occurred, without [which]

- 8 -

it is irrelevant." (Reply SOF ¶ 26.) The Court disagrees. Plaintiff testified that he confessed to Fr. Bovankovich that Fr. Nanko was molesting him around the age of 12 or 13, and in any event, according to Plaintiff's testimony, the confession occurred during the time in which the molestation was occurring. While this particular evidence does not go to actual notice on the part of the Eparchy that Fr. Nanko had engaged in misconduct creating an unreasonable risk of sexual conduct with Plaintiff before it began, it does go to actual notice on the part of the Eparchy that Fr. Nanko was engaging in sexual conduct with Plaintiff, a minor, while it was occurring.[1]

Defendant also contends that Plaintiff's deposition testimony "is directly controverted" by his testimony that "he hadn't told anyone about the abuse until he told his wife, Barbara, in approximately 1993." (Reply SOF ¶ 26.) This is simply a question for a factfinder going to Plaintiff's credibility. A reasonable jury could well conclude that Plaintiff did not contradict himself by saying he hadn't reported the abuse until 1993 and then saying he confessed it to Fr. Bovankovich real-time, because the purpose of confession—admission and acknowledgement of one's own sins for the purpose of seeking forgiveness or mercy—is markedly different from reporting someone else's misconduct.

Plaintiff's testimony regarding his confession to Fr. Bovankovich that Fr. Nanko was molesting him is sufficient to create a genuine issue as to whether the Eparchy had knowledge or actual notice that one of its employees was engaging in sexual conduct or sexual contact with Plaintiff, a minor, such that Plaintiff's claim would not be time barred under Arizona's window legislation. For this reason, the Eparchy is not entitled to summary judgment on the issue of knowledge or actual notice.[2]

---

[1] The Eparchy makes no argument that Fr. Bovankovich was not an agent of the Eparchy.

[2] The parties do not raise or argue any issues as to clergy-penitent privilege or whether Fr. Bovankovich could have taken any action using the information he learned from Plaintiff's confession—issues going to Plaintiff's negligence claims and whether the Eparchy breached a duty. A reasonable factfinder could well conclude that Fr. Bovankovich could have taken action without betraying Plaintiff's confidence or compromising any duty not to disclose Plaintiff's confession, including offering spiritual guidance to Plaintiff, encouraging him to seek help from law enforcement or a professional counselor, or informing members of the Eparchy's hierarchy regarding Fr. Nanko's conduct using a pseudonym for Plaintiff. The Court thus cannot conclude that information communicated via Plaintiff's confession was not actual notice on which the Eparchy could have acted.

Alternatively, with regard to whether the Eparchy had knowledge or actual notice of the misconduct of an employee—Fr. Nanko—that created an unreasonable risk of sexual conduct or sexual contact with a minor—Plaintiff—before it began, Plaintiff offers a timeline supported by several pieces of evidence. On January 28, 1963, just after he was ordained as a priest, Fr. Nanko wrote to Bishop Nicholas T. Elko to request a transfer away from Holy Ghost Byzantine Catholic Church in Cleveland, Ohio—the church he had been assigned to after he was ordained—after a "lengthy discussion with the Dean of the Cleveland Deanery," citing the following reasons: "1) Peace of Conscience, (2) Harmony in the Rectory, 3) Avoidance of Scandal in the Parish, and 4) Personal Mental Health." (PSOF ¶ 8 & Ex. 3.)

Bishop Elko transferred Fr. Nanko to St. Mary Byzantine Catholic Church in Cleveland, and two months later, a parishioner from St. Mary's wrote to Bishop Elko—who had formerly been a pastor at St. Mary's—to report on Fr. Nanko's conduct. (PSOF ¶ 9.) Specifically, on March 29, 1963, the parishioner wrote:

> [Y]ou did Holy Ghost a big favor by taking [Fr. Nanko] out of there because they say he acted like an overgrown child, running around with certain teenagers, taking them to outdoor theatres until two and three in the morning, which is unheard of for a priest to do. . . . Now, they don't only go out with him, but have a lot of good times at his place. There are parties constantly going on there. . . . The boys give him good times, radio or music that plays the Twist, Rock n Roll, etc. You wonder how I know all this. People at the Holy Ghost church had their eyes and ears open to a lot of this. . . . My husband and I stopped for gas one day, and the attendant that waited on us got to talking and he told us he belongs to Holy Ghost and we told him we were members of St. Mary's. He then said "So you got lover boy for your assistant." He also said Thank God the Bishop took him away, but he didn't take him far enough. . . . He then said his son was running around with him, and the boy was always tired and sleepy. Why shouldn't he be, when Father Nanko kept him out until three in the morning. The attendant said he soon put a stop to it. . . . It is also sad to say that when he was at Holy Ghost, people that live near there said they never saw anything more disgusting than on Saturday afternoons when these boys hung around the church during confessions and in the evening all dressed up to kill. We would think that on Saturday night, a priest prepares for Sunday Mass and sermon but instead, he

went horsing around with the boys. . . . I have two children that are going to be ready for [the high school]. I hate to say this, but my husband and I are thinking of changing our minds and not sending them there, as we feel [Fr. Nanko] is not the type for a prefect. You don't know, but a lot have been covering up for him. . . Someday, I will see you and have a heart to heart talk with you. My husband hopes it is soon. This is a lot more to talk about.

(PSOF Ex. 4.)

Next, a December 23, 1965 memo detailed an incident at the Byzantine Catholic High School in Parma, at which Fr. Nanko had become the principal. (PSOF Ex. 5.) Four students at the school were accused of theft, and in response, one of the students stated that if the students were prosecuted, they would report that Fr. Nanko had given them beer and allowed them to drive a car without a driver's license. (PSOF Ex. 5.) Fr. Nanko appears to have denied these allegations. (PSOF Ex. 5.)

The Eparchy transferred Fr. Nanko from Cleveland to Phoenix to work at St. Stephen in 1970. (PSOF ¶¶ 13–14.) On May 21, 1970, when Bishop Edward A. McCarthy of the Roman Catholic Diocese of Phoenix considered appointing Fr. Nanko as a high school principal in that Diocese, he called Bishop Emil J. Mihalik of the Eparchy in Parma to obtain his approval. (PSOF Ex. 6.) Bishop Mihalik wrote to Bishop McCarthy to offer him "precautions." (PSOF Ex. 6.) Among them, Bishop Mihalik wrote: "There has been repeated rumors in the Cleveland area concerning [Fr. Nanko's] moral character particularly with boys. We have observed some unusually strong personal attachments between Father Al and a certain small group of boys in [our] own high school here in Parma." (PSOF Ex. 6.) Bishop Mihalik stated that, so long as Bishop McCarthy took these and other facts into consideration before appointing Fr. Nanko, Bishop Mihalik had no objection allowing Fr. Nanko to work as a principal at a Roman Catholic high school in Phoenix. (PSOF Ex. 6.)

None of the evidence Plaintiff provides explicitly states that the Eparchy knew Fr. Nanko engaged in sexual conduct or sexual contact with minors. But it does show that, from the period from 1963 to 1970 when Fr. Nanko was in the Cleveland area, the Eparchy had actual notice that Fr. Nanko requested a transfer from Holy Ghost Byzantine Catholic

- 11 -

Church—his first assignment—stating it was "absolutely necessary" for "avoidance of scandal" and "peace of conscience," among the reasons (PSOF Ex. 3); that Fr. Nanko was "running around" with teenage boys and they had "a lot of good times at [Fr. Nanko's] place" (PSOF Ex. 4); that a parishioner referred to Fr. Nanko as "lover boy" (PSOF Ex. 4); and that students at the high school at which Fr. Nanko was the principal accused him of giving them beer. (PSOF Ex. 5.) When it transferred Fr. Nanko to Phoenix, the Eparchy expressed its awareness of Fr. Nanko's conduct when Bishop Mihalik from the Eparchy cautioned Roman Catholic Bishop McCarthy of "rumors in the Cleveland area concerning [Fr. Nanko's] moral character particularly with boys," including that the Eparchy had "observed some unusually strong personal attachments between [Fr. Nanko] and a certain small group of boys" in the school. (PSOF Ex. 6.) Plaintiff has thus offered sufficient evidence to create a genuine issue of fact as to whether the Eparchy had knowledge or actual notice of *misconduct* on the part of Fr. Nanko creating an *unreasonable risk* of sexual conduct or sexual contact with minors—an alternative means of invoking the window legislation. A factfinder must determine if Plaintiff has met his burden with clear and convincing evidence.

Lastly, Plaintiff proffers evidence to try to show a pattern on the part of the Eparchy in its handling of reports of priests who had engaged in sexual misconduct with minors. (PSOF ¶ 35.) Specifically, in February 1984, two Cleveland-area brothers, James and Ken Kotyk, reported to the Eparchy that they had been sexually abused by priests within the Eparchy as children, one by Fr. Nanko, presumably before the Eparchy transferred Fr. Nanko from the Cleveland area to Phoenix in 1970, and the other by Fr. John Rebovich, who remained the priest at St. Eugene's Parish in Bedford, Ohio. (PSOF Exs. 13, 14.) Monsignor Andrew Vaida, who was the administrator of the Eparchy upon the death of Bishop Mihalik, received the brothers' report and "said that he had received similar reports, relating to Fr. Rebovich." (PSOF Ex. 13.) James Kotyk requested that Fr. Rebovich be removed from their church in Bedford and sent to counseling, to which Msgr. Vaida agreed. (PSOF Ex. 13.)

In a statement, Msgr. Vaida said, "Sordid, heart-breaking and most demeaning were the allegations against Rev. Rebovich. Threats to carry the priest's activities to the newspapers were allayed and put aside when the priest was sent by us—after much consideration—to visit our missions in the western reaches of the Diocese of Parma." (PSOF Ex. 14.) Subsequently, "[t]he matter was brought up to the newly-appointed Bishop, Andrew Pataki, in July of 1984, who for one reason or another did not think it to be too alarming and re-instated Fr. Rebovich to the Bedford Parish." (PSOF Ex. 14.)

In another incident, in 1989, Bishop Pataki wrote to Cardinal Lourdusamy in Rome to request "guidelines and instruction" for laicizing another priest who they knew had had "many experiences" of pedophilia and who had recently been found guilty of pedophilia in civil court in Minneapolis. (PSOF Ex. 12.)

Plaintiff argues that this evidence regarding the Eparchy's handling of sexual misconduct on the part of other priests shows the Eparchy's practices of concealing the sexual misconduct and sending offending priests to the "western reaches" of the Eparchy. The Court does not rely on this evidence to deny the Eparchy's motion for summary judgment, and the Court will address any admissibility issues with respect to this evidence in the context of the parties' pretrial motion practice.

### B.     Constitutionality of the Window Legislation

The Eparchy also argues that the window legislation violates its due process rights under the Arizona Constitution.[3] As a first principle, under Arizona law, an act of the legislature—such as its enactment of the window legislation in 2019—is "presumed constitutional, and where there is a reasonable, even though debatable, basis for the enactment of the statute, the act will be upheld unless it is clearly unconstitutional." *State v. Arevalo*, 470 P.3d 644, 647 (Ariz. 2020) (quoting *State v. Ramos*, 648 P.2d 119, 121 (Ariz. 1982)) (internal quotation marks omitted).

---

[3] Plaintiff requests that the Court strike the Eparchy's argument because the Eparchy failed to comply with A.R.S. § 12-1841, which requires it to serve its claim that an Arizona statute is unconstitutional on "the attorney general and the speaker of the house of representatives and the president of the senate." Because the Court finds that the window legislation is constitutional under Arizona law, it need not address Plaintiff's request to strike.

In its briefing, the Eparchy relies heavily on the fact that the high courts of certain other states have found statutes allowing the revival of time-barred claims to be violative of their state constitutions. *See Doe v. Hartford Roman Cath. Diocesan Corp.*, 119 A.3d 462, 516 (Conn. 2015) (concluding statute reviving otherwise time-barred sexual abuse claims does not violate Connecticut's due process clause but noting in a survey that 18 states allow the revival of time-barred claims while 24 do not). The Court's task, of course, is to determine what Arizona case law teaches about the constitutionality of legislative acts allowing revival of time-barred claims.

In *Chevron Chemical Co. v. Superior Court*, 641 P.2d 1275 (Ariz. 1982), the Arizona Supreme Court found a statutory revision giving an injured worker an extra year to sue a third-party tortfeasor and allowing such claims even if the prior statute of limitations period had expired—that is, allowing the revival of previously barred claims— did not violate the due process clause of either the United States or Arizona Constitutions. In so concluding, the Court declined to find that "the right to raise a one year statute of limitations defense instead of a two year statute of limitations defense is a vested property right within the protection of the Fourteenth Amendment even if the result may be increased liability on the part of the defendant." *Id.* at 438 (citing *Campbell v. Holt*, 115 U.S. 620 (1885), for the proposition that "a state may restore a barred remedy without violating the Fourteenth Amendment"); *see also San Carlos Apache Tribe v. Superior Ct.*, 972 P.2d 179, 192–93 (Ariz. 1999) (upholding as constitutional the legislature's extension of the statute of limitations period to make a water rights claim, even though the prior deadline to file claims had passed).

The Eparchy argues the window legislation is different because it extended the limitations period—albeit temporarily—for a substantially longer period of time. But the Arizona case law does not examine the length of time involved in the claim revival in assessing its constitutionality; rather, the Arizona Supreme Court reasons that the expiration of a statute of limitations period is not a vested right precluding application of a revival law. Because the Court cannot conclude the window legislation is "clearly

- 14 -

unconstitutional" under Arizona law and must presume the constitutionality of a legislative act, *Arevalo*, 470 P.3d at 647, the Court finds the window legislation does not violate the due process clause of the Arizona Constitution.[4]

**IT IS THEREFORE ORDERED** denying Defendant Byzantine Catholic Diocese of Parma's Motion for Summary Judgment (Doc. 53). This matter will proceed to trial, and the Court will set a pre-trial conference by separate Order.

Dated this 13th day of September, 2024.

Honorable John J. Tuchi
United States District Judge

---

[4] As cited by Plaintiff (Resp. Ex. D), two judges of the Arizona Superior Court arrived at the same conclusion with respect to the constitutionality of the window legislation.